**COMMONWEALTH**
vs.
**Charles A. SHEHADI and**
**James C. GROVES**

No. 032716-21

Superior Court/Suffolk, ss.
Commonwealth of Massachusetts

**June 21, 1982**

**Bernard Manning, Asst. A.G.,** counsel for plaintiff.
**Frank Mondano,** counsel for defendant.

## FINDINGS, RULINGS AND ORDER ON THE DEFENDANT CHARLES A. SHEHADI'S MOTION TO SURPRESS
### INTRODUCTION

By the defendant Shehadi's motion to suppress, he seeks to have suppressed the substance of telephone conversations between him and the defendant Groves, which conversations were recorded with Groves' permission but without a warrant or other judicial authorization and without either Shehadi's knowledge or consent. A transcript of those conversations is attached to the agreed statement of facts made between the Commonwealth and each defendant. Shehadi has advanced several grounds in support of his motion, including that G.L. c. 272, sec. 99 is not applicable on the facts here. I note that the defendant's motion was filed before the Supreme Judicial Court's decision in **Commonwealth v. Thorpe,** Mass. Adv. Sh. (1981) 1827.

### FINDINGS OF FACT

After hearing on the above motion, from the evidence by way of testimony and the facts agreed-to, I find the facts relevant and material to the relief sought by the defendant in his Motion as follows:

In January, 1980, a person, whose name is Littig, went to the Wonderland Race Track with eight so-called winning tickets for a race which took place in August, 1979. When he arrived at Wonderland, Littig was referred to the so-called "Outs(tanding) Window" where a person may present and obtain the pay-off of winning tickets sought to be cashed-in late for up to a year after the date of the race. Wonderland maintains a so-called "Outs(standing) Book" containing information about winning tickets not cashed-in on the date of the race. After Littig presented those tickets, a staff person at Wonderland determined that although the tickets presented by Littig had in fact been paid off, the tickets were genuine and then paid them off.

After receiving and evaluating that information about Littig, officials at Wonderland conducted an audit and investigation and during the course of that investigation they interviewed the defendant Shehadi, who was then a tickets manager who accounted for "Outs[tanding] Tickets" in the "Outs Book" and then retained them in Wonderland's "Ticket Room." As set out in the agreed statement of facts, as a result of the audit of Wonderland's financial records, a shortage of approximately $40,000 was discovered. Members of the Massachusetts Attorney General's Criminal Bureau then conducted an investigation to determine the nature of the shortage. During the course of the Bureau's investigation, the defendant Groves, also a Wonderland employee, was interviewed and he agreed to cooperate with members of the Bureau.

During the Bureau's investigation, Groves, among other things, informed Assistant Attorney General Fred Riley, then and to the present time Chief of Criminal Investigations in the Office of the Attorney General, that in March and April of 1979, he, Groves, was a so-called "Outs Cashier." During that time Shehadi approached Groves and

informed him that he knew of a method to steal money at Wonderland via the "Outs" procedures. In May and June, 1979, both Shehadi and Groves began to steal money from Wonderland in the following manner. On the day of the race, Shehadi would obtain tickets which had been cashed-in. He would then erase the casher's stamp date and after that receive money from the "Outs" cashier and then overstamp the ticket. Shehadi would then split the proceeds with Groves. Assistant Attorney General Riley learned that both defendants stole approximately $45,000 in 1979 and a smaller amount in 1980.

Riley concluded that Groves was being totally candid, without the need either for further corroboration or verification by a polygraph test. Riley concluded also that Shehadi required a contact person in Wonderland's money room who would give him money for doctored "Outs" tickets and that this was a highly organized scheme. Riley concluded as well that what was occurring was organized crime, that there was a conspiracy between Shehadi and Groves, and that Shehadi's modus operandi was highly disciplined and organized. With Groves' consent, Riley placed a recording device on Groves' telephone and recorded his (Groves') telephone conversations with Shehadi.

## RULINGS OF LAW

Shehadi urges that the court suppress, pursuant to G.L. c. 272, sec. 99 P, certain recorded telephone conversations as unlawful interceptions. Warrantless interception is prohibited by G.L. c. 272 (the wiretap statute) unless the interception falls within one of the exemptions found in sec. D. None of the exemptions are applicable here.

In addition, sec. 99 B 4 excludes certain communications from the definition of interception within the meaning of the statute. G.L. c. 272, sec. 99 B 4 reads in relevant part ". . . that it shall not constitute an interception for an investigative or law enforcement officer as defined in this section, to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such party and if recorded or transmitted in the course of an investigation of a designated offense as herein defined." A designated offense, as defined by sec. 7, includes certain offenses **in connection with organized crime** as defined in (the) statute's preamble." (emphasis added).

Shehadi argues that what occurred here does not support a finding that the alleged offense falls within the ambit of organized crime and I agree. Two recent decisions, **Commonwealth v. Thorpe,** Mass. Adv. Sh. (1981) 1827, and **Commonwealth v. Jarabek,** Mass. Adv. Sh. (1981) 1849, compel this result.

The **Thorpe** Court adopted a portion of the wiretap statute's preamble as the definition of organized crime as follows: "a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." **Commonwealth v. Thorpe, supra,** at 1833. In addition, the Court articulated a standard of reasonable suspicion necessary to uphold warrantless electronic surveillance. That standard "is . . . a showing of articulable facts from which a reasonable person could conclude that interception would lead to evidence of a designated offense." **Id.** at 1837.

The facts in **Thorpe** which upheld such a showing included a statement by the defendant that a police promotion examination was available to him through an organization led by a woman and the inference which could be drawn that discipline and organization would be necessary in order to unlawfully supply such examinations. **Id.** In contrast, the **Jarabek** Court affirmed the lower court finding that the standard was not met where two public officials sought a kickback from one contractor. **Commonwealth v. Jarabek, supra,** at 1853.

The Commonwealth's belief that interception would lead to evidence of a designated offense is founded primarily on the information given by Groves. To begin with I find that information meets

the **Aguilar v. Texas,** 378 U.S. 108, 114 (1964) two-prong test of reliability. First, Groves related the means by which the scheme was carried out. Second, Groves may be considered credible because he implicated himself in a serious crime (**Commonwealth v. Vynorius,** 369 Mass. 17, 21, (1975) ) and independent investigation corroborated the story. **Id.** at 21-22. Groves informed (Riley) that Shehadi told him that **he** (Shehadi) knew how to steal the money from Wonderland and that Shehadi and he (Groves) then implemented the plan. There is no reference to any third party involvement as was present in **Thorpe.** In addition Riley believed that Shehadi required a third party in the Wonderland money room and that the method of operation was highly disciplined and organized and thus organized crime was occurring.

There is, however, no objective basis for that conclusion. Shehadi's status as a tickets manager would seem sufficient to give him access to anything required to carry out the scheme. Groves and Shehadi "split" the proceeds of approximately $45,000. Wonderland's internal audit disclosed a shortage of approximately $40,000. This belies the notion of a contact person or others in a group because there seem to be additional monies from which these others would be paid off.

Because I find that the Commonwealth has failed to meet its burden of establishing that the warrantless electronic surveillance was for the purpose of seeking evidence of a designated offense in connection with organized crime, I find it unnecessary to address the other arguments advanced by Shehadi in support of suppressing the contents of the recorded conversations. However, Shehadi also seeks to suppress any of Groves' live testimony relative to the recorded conversations. The **Jarabek** Court squarely addressed this issue and concluded that live testimony does not come within the meaning of contents which may be suppressed pursuant to sec. 99 P. **Jarabek, supra,** at 1856.

**ORDER**

For the foregoing reasons, this Court allows Shehadi's motion to suppress the contents of all interceptions of wire or oral communications of the defendant and any evidence derived therefrom. The Court denies Shehadi's motion to suppress Groves' live testimony.

<div align="right">

**Paul G. Garrity**
**Justice of the Superior Court**